UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JERAMIE WADE IVY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:22-CV-34-SNLJ |
| KILOLO KIJAKAZI,<br>Commissioner of the Social<br>Security Administration, | ) ) ) ) ) |
| Defendant. | ) ) |

# MEMORANDUM AND ORDER

The Commissioner of the Social Security Administration denied plaintiff Jeramie Wade Ivy's application for Disability Insurance Benefits under Title II of the Social Security Act.  Plaintiff now seeks judicial review of the Administrative Law Judge's ("ALJ") decision.  The case is fully briefed.  As explained below, the ALJ's decision is supported by substantial evidence on the record as a whole and is affirmed.

## I. Procedural History

Plaintiff was born in 1975.  He filed an application for disability insurance benefits on August 14, 2019, alleging an onset date of July 26, 2019.  His claim was rejected, and he requested a hearing by an ALJ.  After the hearing, the ALJ issued an unfavorable decision, finding that plaintiff was not disabled.  Plaintiff filed for review by the Appeals

Council, and the Appeals Council denied plaintiff's request for review. Thus, the ALJ's decision is the final decision of the Commissioner. Plaintiff seeks judicial review.

## II. Disability Determination—Five Steps

Regulations define disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); *id.* § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A); *id.* § 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. §§ 404.1520(a), 416.920(a). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a

slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d), 416.920(c), 416.920a(d).  "The severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs." Soc. Sec. Ruling 85-28 (listing basic work activities).  The claimant carries the burden to show that an impairment is severe. *Kirby*, 500 F.3d at 707–08.

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled— regardless of age, education, and work experience—and this ends the analysis. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(3)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is

3

nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history. . . ." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If the ALJ determines that the claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, then burden of production shifts to the Commissioner to show that the claimant maintains the RFC to perform other work that exists in significant numbers in the national economy. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n.5 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Though the burden of production shifts to the commissioner, the claimant keeps the burden of persuasion to prove disability. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)( v). If the claimant cannot make an adjustment to other work, then the claimant is disabled. *Id.*

### III. The ALJ's Decision

At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 26, 2019.  At Step Two, the ALJ found that plaintiff has severe impairments of ulcerative colitis, migraines, degenerative disc disease of the cervical spine, asthma, neuropathy of the bilateral lower extremities, anxiety disorder, major depressive disorder, and a history of a learning disability. [Tr. 14.] The ALJ also considered plaintiff's non-severe impairments in assessing the RFC. *Id.*

At Step Three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [Tr. 15–20.]  Plaintiff does not challenge this determination.  The ALJ specifically addressed why plaintiff's migraines—though a medically severe impairment—did not meet one of the listed impairments that would render plaintiff totally disabled.  [Tr. 16.]  A medical diagnosis for migraine headaches requires, in part, that a person experiences "intense headache[s] with more than moderate pain and with associated migraine characteristics and phenomena." [Tr. 16.] "Though the claimant frequently sought emergency care for headache, he only appeared on one occasion in the medical evidence of record in visible discomfort; otherwise, he was awake, alert, and in no acute distress, signifying that his impairment was not of moderate or severe pain intensity." [Tr. 16] (citing Tr. 581, 1012, 1051, 1061.)

At Step Four, the ALJ calculated plaintiff's RFC, finding that:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can never climb ladders, ropes, or scaffolds.  He can frequently climb ramps and stairs, stoop, crouch,

>and crawl.  The claimant can have occasional exposure to extreme heat, humidity, dusts, fumes, odors, gases, and poor ventilation.  He can work in an environment with no more than a moderate noise level as defined in the Selected Characteristics of Occupations.  The claimant can perform work limited to simple, routine, repetitive tasks.  He can make simple, work-related decisions. He can perform work that is not at a production pace rate, defined as work with an assembly line or conveyor belt.

[Tr. 20.]  The ALJ recognized plaintiff's testimony that "migraines keep him in bed all day and night at times, and cause severe pain and sensitivity to light, sound, and smells, though he did note that they are improving with his new medication, and now occur only two to three times per week."  [Tr. 20.]  The ALJ thought that plaintiff's statements on the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the evidence in the record.  [Tr. 21.]  Though plaintiff presented himself to the emergency room on numerous occasions for complaints of headaches, he generally appeared in no acute distress.  [Tr. 24.]  Nor did plaintiff follow the emergency room doctor's instruction to follow up with his primary care physician.

    The ALJ then discussed plaintiff's numerous visits, and how plaintiff oftentimes appeared alert, awake, fully oriented, with a pleasant mood, and his eyes appeared normal, with pupils that were equal, round, and reactive to light or negative for acute changes.  [Tr. 24–25].  The ALJ thought that plaintiff's migraine could be accommodated by an RFC with a limitation to only occasional exposure to extreme heat, humidity, and pulmonary irritants, and a requirement that plaintiff work in an environment with no more than a moderate noise level.  [Tr. 27.]  The ALJ did not include any additional limitations for time off task or absences because she thought plaintiff's condition was managed by medication.  Furthermore, she doubted the severity of plaintiff's symptoms as he described them

6

because they were not noted by emergency department treatment providers: "For example, the claimant generally appeared to visits at the emergency department reporting terrible migraine in no apparent distress. . . ." [Tr. 28.] The ALJ did not dispute plaintiff's testimony that he had migraines two to three times per week.

In reviewing the medical opinions of state agency medical consultants for plaintiff's pain levels, the ALJ found that Dr. Steven Fishburn's and Dr. Paul Ross's evaluations was partially persuasive. [Tr. 29.] Of note, Dr. Fishburn did not think that plaintiff's complaints of migraines were fully consistent with the objective medical evidence. [Tr. 171.] Dr. Fishburn did not think that plaintiff's migraines rendered plaintiff totally disabled. The ALJ also reviewed the medical opinions of Dr. Ross. [Tr. 12–14.]. Dr. Ross had the same conclusions as Dr. Fishburn. [Tr. 193.]

At Step Five, the ALJ found that the plaintiff could not perform his past relevant work; his prior jobs were categorized at the medium exertional level. [Doc. 29.] The ALJ relied on vocational expert testimony [Tr. 68–70] to conclude that plaintiff could perform other work as cleaner, assembly-line worker, or housekeeper. [Tr. 30–31.] Accordingly, the ALJ concluded that plaintiff was not disabled.

**IV.   Standard of Review**

The Court must affirm the ALJ's decision if it is supported by substantial evidence on the whole record. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This

7

"substantial evidence test," however, is "more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (*quoting Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)) (alteration in original). The Court must also consider any evidence that fairly detracts from the ALJ's decision. *Id.* The Court must give the record a "searching inquiry" and balance the weight of the evidence in favor of the ALJ's decision against the weight of the evidence that detracts from the ALJ's decision. *Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998). "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992); *see also Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (citing cases).

In reviewing whether the ALJ's decision was supported by substantial evidence, this Court does not substitute its own judgment for that of the ALJ: even if different conclusions could be drawn from the same evidence, and even if this Court may have reached a different outcome. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

V. **Discussion**

Plaintiff raises one argument on appeal: that the ALJ did not support her analysis at Step Four when discussing the frequency and severity of plaintiff's migraines. Plaintiff argues that the ALJ discounted both the frequency and severity of plaintiff's migraines. [Doc. 8 at 6.] Also, plaintiff argues that the ALJ improperly discredited plaintiff's testimony; that plaintiff's testimony as to the severity of his symptoms was supported by the medical evidence. *Id.* at 7. Because plaintiff only argues against the characterization of the severity of plaintiff's migraines, this discussion will only look at plaintiff's migraines, and not any of plaintiff's other severe impairments.

A. **Plaintiff's Treatment for Migraines**

Plaintiff argues that his numerous visits to the emergency room corroborate the severity of plaintiff's migraines. Also, plaintiff argues that even though plaintiff reported improvement from his migraine medication, [Doc. 924] plaintiff's migraines were still so severe that plaintiff is rendered disabled. [Doc. 8 at 10.] Because much of the ALJ's evaluation of plaintiff's symptoms come from plaintiff's treatment notes, plaintiff's treatment history needs discussion.

On September 13, 2019, plaintiff saw Andina Acharya, M.D., his neurologist. Plaintiff reported that previous Botox treatments initially helped his migraine headaches, but they no longer did. [Tr. at 393.] Dr. Acharya indicated plaintiff had failed prophylactic migraine medications, and was a good candidate to start the new CGRP modulating medication, and prescribed him Aimovig. [Tr. at 396.]

9

On October 6, 2019, Plaintiff visited the emergency room with a migraine headache and reported nausea. [Tr. at 541.] He was negative for fever and vomiting. *Id.* Plaintiff reported that his migraine headache was similar to other ones he had. *Id.* A provider note states that "[Plaintiff] is well known to this emergency department for frequent visits due to migraine headaches." [Tr. 541–42.] He appeared anxious and reported a recent panic attack. [Doc. 541.] Plaintiff appeared alert, awake, non-toxic, anxious, and uncomfortable. [Doc. 542.] A neurological orientation revealed he had normal orientation. [Tr. 542.] Plaintiff could perform alternating rapid hand movements and had a steady gait. [Tr. 543.] He received Toradol and promethazine shots, which alleviated his symptoms. [Tr. at 541, 543.]

On October 30, 2019, plaintiff reported to the emergency room due to nausea and vomiting accompanied by a headache. [Tr. 516.]. Staff described plaintiff as alert and awake. [Tr. 517.] He received Phenergan and morphine injections, which alleviated his pain. [Tr. 518.]

On November 13, 2019, at 12:03 AM, Plaintiff reported to the emergency room complaining of headaches. [Tr. 511.] The physician noted "[plaintiff] presents the ED with another of his 'migraine headaches.'" *Id.* (quotation marks in original). Plaintiff was described as awake, alert, and in no distress. [Tr. 512.] Plaintiff was described as pleasant and cooperative, with a flat affect. [Tr. 512.] Plaintiff was given medication for his headache and discharged. [Tr. 513.] Later that same day at 5:54 PM, plaintiff again appeared in the emergency room, this time complaining of nausea and vomiting, possibly caused by mono. [Tr. 506.] Plaintiff reported another headache. *Id.* Plaintiff stated he

10

got no relief from his headaches from the earlier prescribed medication. *Id.* Plaintiff was described as alert, awake, in no acute distress. [Tr. 507.] His pupils were normal. *Id.* Plaintiff was again prescribed medications and dismissed. *Id.*

On December 8, 2019 plaintiff returned to the emergency room with reports of migraines. Plaintiff described the migraine as "pounding, similar to previous headaches." [Tr. 1011.] He reported nausea alongside the migraines, but no vomiting. *Id.* He reported that his primary care physician recommended he stay hydrated and consume electrolytes. *Id.* Plaintiff was described as awake, alert, and in no acute distress. [Tr. 1012.] His pupils were equal, round, and reactive to light and accommodation. *Id.* He was pleasant and cooperative. *Id.* He was given injections of medicine and discharged. [Tr. 1013.]

On March 6, 2020, plaintiff returned to his neurologist, Dr. Acharaya, for his migraines. [Tr. 924.] Dr. Acharaya noted that plaintiff responded well to the prescription of Aimovig but was also still on Elavil, Depakote, and Topamax. [Tr. 924.] Dr. Acharaya noted that plaintiff was in no distress. [Tr. 930.] She also told plaintiff to maintain a headache calendar and suggested a follow-up in six months. [Tr. 931.]

On March 23, 2020, plaintiff went to the emergency room complaining of migraine headaches. [Tr. 1022.] He reported his headache was "pounding" and "throbbing", and was aggravated by light and noise. [Tr. at 1022.] Plaintiff's reported pain indicated that "[a]t its worst the pain was moderate." [Tr. 1022.] Plaintiff appeared alert, awake, and uncomfortable. [Tr. 1023.] He received medication and was discharged. [Tr. at 1023.]

On August 9, 2020, plaintiff returned to the emergency room with a headache. [Tr. 1045.] He described sensitivity to light and sound, with accompanying nausea and

11

vomiting. [Tr. 1045.] Plaintiff was described as alert, awake, his eyes were normal, and his gait was steady. [Tr. 1046.] He received medications and was discharged. [Tr. at 1046–1047.] A few days later, he followed up with Dr. Montgomery as recommended by the emergency room doctor. [Tr. at 724.]

On August 25, 2020, plaintiff again went to the emergency room for headaches. [Tr. 1050.] He said the headache had been ongoing for two days. *Id.* Plaintiff reported, at worst, moderate levels of pain. *Id.* Plaintiff was described as awake, alert, in no acute distress, his eyes were normal, and he was pleasant and cooperative. [Tr. 1051.] Plaintiff was given medicine and discharged. [Tr. 1052.]

On September 11, 2020 at 1:54 AM, plaintiff returned to the emergency room with a headache that he described as "pounding, throbbing." [Tr. 1060.] This headache was different from plaintiff's previous headaches because "normally he has headaches on the right side of his head but this headache [was] across his forehead." *Id.* Another note was added: "[plaintiff] has been seen in this ER multiple times with same complaint. He states that he has not followed up with his primary care provider concerning his headaches." *Id.* He was described as awake, alert, and in no acute distress. [Tr. 1061]. His pupils were normal. *Id.* He was given medicine and discharged. [Tr. 1062.]

Plaintiff returned to the emergency room later that same evening at 9:20 PM. [Tr. 1056.] Plaintiff described the headache as "pounding, throbbing," in the top of his head and forehead *Id.* Plaintiff described this headache as similar to previous episodes, which contradicts his earlier statement from that morning, that his headaches normally occur on the right side of his head. *Compare* [Tr. 1060 with Tr. 1056.] Plaintiff was seen by the

12

same emergency room physician, who added a note, "saw this patient in the emergency room yesterday with the same complaint. He states that his pain was relieved and then came back again last night. He did not follow up with his primary care as directed. He also did not get his prescriptions filled that he was given yesterday." [Tr. 1056.] He was described as awake, alert, and in no acute distress. [Tr. 1057.] His eyes were normal. *Id.* Plaintiff was given medicine, which helped with the pain, and he was discharged with instructions to follow up with his primary care physician. [Tr. 1058.]

In all, the record has eleven instances where plaintiff visited the emergency room with a primary complaint of headaches. In a few instances, plaintiff was described as appearing uncomfortable. In most instances, plaintiff was described as appearing in no acute distress, awake, alert, with normal eye function.

### B. Plaintiff's Testimony

At a hearing before the ALJ, plaintiff testified that he could not work because his migraines could sometimes keep him in bed all day and night. [Tr. 50.] While some of plaintiff's medication helped to reduce the frequency and severity of migraines [Tr. 54], plaintiff said he would still get headaches two-to-three times per week—even with his medication. [Tr. 54.] He described the pain as a severe stabbing pain, with a sensitivity to light, sounds, and smells. [Tr. 53.] He stated that the pain is so severe that all he can do is lay down in a dark room and sleep, except when his migraines are especially severe, he goes to the emergency room. [Tr. 53, 54.] The pain is also so severe that it interferes with

13

his ability to perform daily activities, like driving, except for when he needs to go to the emergency room. [Tr. 62, 66].

### C. The ALJ's Evaluation

Plaintiff argues that the ALJ inadequately considered the record evidence when she discounted plaintiff's testimony. [Doc. 8 at 6–7.] Also, plaintiff argues that the ALJ's assessment of plaintiff's symptoms inappropriately relied on a selective reading of the record, and that the ALJ failed to consider other evidence that supported plaintiff's testimony. *Id.* at 8 (citing *Nail v. Kijakazi*, No. 4:20-CV-1422-CDP, 2022 WL 832328, at *3 (E.D. Mo. Mar. 21, 2022)). Finally, the plaintiff argues that the ALJ failed to address how plaintiff's migraines impacted his daily activities. [Doc. 8 at 11.]

The Commissioner makes the final RFC determination based on all the relevant evidence, including medical records, observations of physicians, and the plaintiff's own description of the severity of symptoms. *Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020) (citing cases). "Similarly, the underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints," but is based on categories of evidence and regulatory factors that help to evaluate the intensity, persistence, and limiting effects of symptoms and whether the plaintiff's subjective complaints are consistent with medical evidence. *Id.* (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

In crafting the RFC, the ALJ summarized some of plaintiff's testimony, including that plaintiff would experience severe migraines two-to-three times per week that would

14

leave him bedridden for hours. [Tr. 20, 24, 50, 53] The ALJ described plaintiff's emergency room visits, as discussed above, including the findings that plaintiff often appeared in no acute distress and had other normal findings. [Tr. 24–25.] The ALJ noted that plaintiff reported improvement with his new medication, and that the frequency and severity of plaintiff's migraines decreased. [Tr. 20, 24–25, 53–54.] The ALJ did not think that plaintiff's migraines interfered with his daily activities and so she did not include an RFC limitation for time-off task, namely because plaintiff's composition during the emergency room visits showed that plaintiff was not in acute distress. [Tr. 28.] An ALJ may discount subjective complaints that are undermined by the medical evidence. See *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019). Likewise, the ALJ relied on the opinion evidence of Dr. Fishburn and Dr. Ross, who both concluded that plaintiff could still perform light work even with his migraines. [Doc. 29.] The ALJ did not doubt the frequency of plaintiff's migraines (that plaintiff would get them two to three times per week), but she did doubt the intensity of those migraines.

In assessing the consistency of Plaintiff's symptoms with the evidence, the ALJ considered the objective medical evidence, including objective examination findings by medical professionals. [Tr. 16, 24–25.] As the ALJ explained, though plaintiff frequently sought emergency room treatment for his headaches, he rarely appeared to be in any form of acute distress. [Tr. 16, 24.] As the ALJ reasoned, if plaintiff was in such severe pain as he purported to be, then there should have been some observations of distress. Instead, the ALJ found the evidence showed Plaintiff very rarely appeared to be in visible discomfort

15

while seeking treatment for headaches. And his mood was often pleasant and cooperative. [Tr. 16, 24-25.]

The ALJ noted plaintiff's repeatedly normal examination findings during emergency room visits, including being alert and in no acute distress, signified that his migraine impairment was not of moderate or severe pain intensity. [Tr. 16, 24-25.] Those findings, listed above, consistently describe plaintiff as showing no signs of distress, despite claims of debilitating pain.  The ALJ readily agreed that plaintiff's migraines were a severe impairment, nor did she discount plaintiff's testimony as to the frequency of migraines, but the ALJ had ample reasons to discount plaintiff's testimony as to the severity of those migraines.

In evaluating Plaintiff's symptoms, the ALJ also properly considered Plaintiff's treatment, including medications. *See* 20 C.F.R. § 404.1529(c)(3)(iv). The ALJ acknowledged Plaintiff's numerous visits to the emergency room with complaints of migraines [Tr. 24–25], but noted that Plaintiff generally did not follow up with his primary care doctor as instructed.  [Tr. 24; *see, e.g.*, Tr. 543, 1013, 1023, 1051–52, 1058.] An ALJ may properly consider a claimant's noncompliance with a treating provider's directions, including failing to seek treatment. *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006).  As the ALJ also noted, Plaintiff's neurologist instructed him to maintain a headache calendar and altered his medication regimen at his September 2019 appointment, starting him on Aimovig. [Tr. 24, 396.]

At his next neurology appointment, plaintiff reported that his "headaches responded well" to the Aimovig. [Tr. 24–25, 924.]  Although "[i]t is possible for a person's health to

16

improve, and for the person to remain too disabled to work" *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003), the fact that plaintiff reported improvement from his medication and treatment—while reporting "no new neurological complaints" [Tr. 924]—supports the ALJ's finding that his complaints of disabling symptoms were not fully consistent with the record. *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (using plaintiff reports of effective medication as evidence that supports the ALJs finding plaintiff not disabled, even when plaintiff "discussed severe or worsening symptoms on other occasions").

Plaintiff's argument that the ALJ failed to support the RFC with substantial evidence is unconvincing.  The ALJ specifically explained that "the severity of symptoms he described was not evident upon examination by emergency department treatment providers," and he generally appeared "in no apparent distress" despite "reporting terrible migraine[s]" [Tr. 28.].  Plaintiff's frequent visits to the emergency room do not, on their own, establish that plaintiff suffered debilitating migraines.  Plaintiff testified that when he suffers migraines the only thing he can do is lie down and wait for them to pass, the pain is so great.  Yet, when plaintiff presents himself to the emergency room for those serious migraines—presumably even more painful than the ones that leave plaintiff bedridden—care providers repeatedly describe plaintiff as being in no acute distress and in a pleasant mood.  In light of this, the ALJ's interpretation of the evidence is a reasonable one and, as such, provides substantial evidence to affirm the RFC.  The ALJ provided ample reasoning to discount plaintiff's testimony as to severity of symptoms, which also provides ample reasoning to conclude that the ALJ did not need to include any additional limitations in the RFC to account for headaches.

17

Next, plaintiff claims that this case is analogous to *Nail v. Kijakazi*, No. 4:20-CV-1422-CDP, 2022 WL 832328 (E.D. Mo. Mar. 21, 2022) [Doc. 8 at 8], but plaintiff is mistaken. The record in *Nail* did not contain repeated objective examination findings that—even in the worst of plaintiff's migraine headaches—plaintiff was alert and in no acute distress.  In any event, *Nail* is not controlling.

Plaintiff suggests that an ALJ may not doubt the severity of migraines absent an express expression of doubt by a treating physician as to the existence or severity of symptoms.  [Doc. 8 at 9–10.]  Plaintiff cites no controlling law that mandates such a rule. The district court cases Plaintiff relies upon to support this argument are distinguishable in that the ALJ in each case placed considerable weight on MRI or CT brain imaging, which is not something the ALJ relied upon in this case. *See* [Doc. 8 at 9–10] (citing *Williams v. Kijakazi*, No. 4:20-CV-1493-DDN, 2022 WL 823062, at *10–11 (E.D. Mo. Mar. 18, 2022); *Gayer v. Saul*, No. 6:19-CV-3302-DGK-SSA, 2020 WL 4937511, at *2 (W.D. Mo. Aug. 24, 2020); *Bungart v. Colvin*, No. 14-4128-CV-C-REL-SSA, 2015 WL 3447850, at *12 (W.D. Mo. May 29, 2015)).

In any event, the ALJ found Plaintiff's migraine impairment was severe at Step Two, so she did not need to consider whether plaintiff's doctors doubted he had migraines. Regardless of whether his doctors thought he was exaggerating his symptoms, they repeatedly observed him to be alert, fully oriented, and in no acute distress during allegedly debilitating migraines. [Tr. 24–25.]  Indeed, treatment notes in the record could support a finding that the emergency room providers were exasperated at plaintiff's frequent visits: one doctor noted that "[plaintiff] presents the ED with another of his 'migraine

18

headaches,'"[1] [Tr. 56] (quotation marks in original), and another doctor noted how plaintiff had appeared in the emergency room twice in the same day without following that doctor's advice to follow-up with a primary care physician or to pick up a prescription that same doctor prescribed. [Tr. 1056.]

Such evidence is inconsistent with Plaintiff's reported symptom severity, and the evidence actually indicates an ability to function normally during migraines. For example, as stated, plaintiff testified that his "normal" migraines left him bedridden for hours or even days, and that he only visited the emergency room when his migraines were severe: but even with his "severe" migraines, plaintiff rarely showed any signs of discomfort or unpleasantness. By rejecting plaintiff's testimony as to the severity of his symptoms—namely, that his migraines would leave him bedridden—the ALJ also rejected the more specific testimony about not being able to complete daily activities during a migraine. [Tr. 20.]

Plaintiff argues that his frequent need for pain medication during emergency room visits corroborates his testimony. But the ALJ never doubted that plaintiff experienced some pain with his migraines; the ALJ only doubted, with reasonable findings, the severity

---

[1] One interpretation of including "migraine headaches" in quotations could be that the provider is quoting plaintiff. But none of the other treatment notes have this type of notation; this notation is unique. Another likely interpretation is that the provider is emphasizing "migraine headaches" with scare quotes, which would suggest that the provider doubts the severity of plaintiff's symptoms or questions the need for plaintiff's visits to the emergency room. But there is nothing in the record that can definitely resolve this ambiguity. Regardless, plenty of other evidence in the record supports the ALJ's decision, so the analysis of this notation does not affect the outcome, nor is the outcome dependent on resolving an ambiguity in the meaning of scare quotes.

19

of plaintiff's migraines. Likewise, the ALJ provided reasonable findings to suggest that plaintiff's pain was effectively treated with medication. Indeed, the ALJ thought plaintiff needed no accommodations for time off task or absences because she thought plaintiff's testimony inconsistent with the medical evidence. [Tr. 28.] Therefore, the ALJ necessarily evaluated plaintiff's daily activities and found that he was able to perform them, even with his migraines.

Plaintiff's argument that the ALJ's decision rests on a "selective reading" of the record is to no avail. Plaintiff's differing interpretations, though a possible way to look at the evidence, cannot supplant the ALJ's reasonable interpretation. The Court will not disturb the ALJ's finding as long as she articulated some grounds to discount plaintiff's subjective complaints. *Swink v. Saul*, 931 F.3d 765, 771 (8th Cir. 2019).

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED** and plaintiff's complaint [Doc. 1] is **DISMISSED** with prejudice. A separate judgment will accompany this Order.

Dated this 17th day of November, 2022.

                                              STEPHEN N. LIMBAUGH, JR.
                                              SENIOR UNITED STATES DISTRICT JUDGE